## IN THE UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| SHANE M. BOBAK, | CASE NO. 1:24-CV-02165-DCN |
| Plaintiff, | JUDGE DONALD C. NUGENT |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

### INTRODUCTION

Plaintiff Shane Bobak challenges the Commissioner of Social Security's decision denying disability insurance benefits (DIB) and supplemental security income (SSI). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter was referred to me under Local Civil Rule 72.2 to prepare a Report and Recommendation. (Non-document entry dated Dec. 13, 2024). For the reasons below, I recommend the District Court **AFFIRM** the Commissioner's decision.

Mr. Bobak applied for DIB on May 20, 2022, alleging he became disabled on January 1, 2020 (Tr. 179), and for SSI on August 27, 2022, alleging he became disabled on August 17, 2007 (Tr. 181).[1] For both applications, he claimed disability due to bipolar disorder, an unspecified

---

[1]  Regardless of the actual or alleged onset of disability, an SSI claimant is not entitled to SSI benefits prior to the date the claimant files an application. Thus, the relevant period of consideration for the SSI claim begins on August 27, 2022, the application date. *See* 20 C.F.R. § 416.335; *see also Koster v. Comm'r of Soc. Sec.*, 643 F.App'x 466, 478 (6th Cir. 2016) ("For purposes of SSI, which is not retroactive, the relevant period here is . . . the date [the plaintiff] filed his protective application."). Because the Commissioner denied an award of benefits, the fact Mr. Bobak filed applications on two different dates is not material to the issues his appeal raises.

psychotic disorder, post-traumatic stress disorder (PTSD) and anxiety. (Tr. 206). After his claims were denied initially and on reconsideration, Mr. Bobak requested a hearing before an administrative law judge. (Tr. 61-94, 128). On August 17, 2023, Mr. Bobak (represented by counsel) and a vocational expert (VE) testified before the ALJ. (Tr. 35-60). On November 17, 2023, the ALJ determined Mr. Bobak was not disabled. (Tr. 22). On October 11, 2024, the Appeals Council denied Mr. Bobak's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-3; *see also* 20 C.F.R. §§ 404.981, 416.1481). Mr. Bobak timely filed this action on December 13, 2024. (ECF #1).

FACTUAL BACKGROUND

## I.      Personal and Vocational Evidence

Mr. Bobak was 32 years old on his alleged onset date and 36 years old at the hearing. (*See* Tr. 62). He has a 10th grade education. (Tr. 39). He has past relevant work experience as a junk hauler, kitchen helper, cleaner in a commercial institution, and construction worker. (Tr. 51, 207).

## II.      Relevant Medical Evidence

**2019.** In August, police brought Mr. Bobak to the emergency department for a psychiatric evaluation after witnessing his agitated, paranoid, and delusional behavior. (Tr. 311-12). Medical providers observed some psychotic symptoms but noted "good effect" after Mr. Bobak received a dose of Zyprexa. (Tr. 312). Mr. Bobak described a history of using marijuana, benzodiazepines, and amphetamines—all of which were present in the toxicology report. (Tr. 309-10, 313). The doctor discussed the association between drug use and behavioral and psychiatric issues and noted Mr. Bobak was not receptive to changing his drug habits. (Tr. 312).

2

In December, Mr. Bobak's mother took him to the emergency department after he was found naked in a factory, stating he was delivering food. (Tr. 434). Mr. Bobak did not remember the event. (*Id.*). At assessment, Mr. Bobak was cooperative but anxious and restless. (Tr. 441). He described feeling overwhelmed. (*Id.*). Except for questionable insight and judgment, the provider noted normal findings on the mental status examination. (*Id.*). His mother described intermittent episodes of manic behavior (including not sleeping or eating, being in a "dreamlike state," and doing drugs) occurring one to three times a year in the past few years. (Tr. 434). Mr. Bobak admitted using cocaine, marijuana, and amphetamines before that episode. (Tr. 434, 436). He described his recent amphetamine use as contributing to his paranoia, sleep deprivation, and erratic behaviors. (Tr. 441). He was diagnosed with polysubstance abuse, amphetamine abuse, cocaine abuse, and marijuana abuse and discharged in stable condition. (Tr. 436-37).

**2020.** In January, Mr. Bobak met with his physician, Nosson Goldfarb, M.D., for his monthly appointment and reported poor sleep. (Tr. 770). He described his panic and paranoia as "manageable," reported working a lot of hours at his job, and endorsed using marijuana that reportedly made his anxiety worse at times. (*Id.*). Dr. Goldfarb refilled Mr. Bobak's prescriptions, including Suboxone for chronic pain management, Valium for anxiety, and gabapentin for foot pain and swelling. (Tr. 770-71).

Mr. Bobak returned for a follow-up appointment at the end of January and reported sleeping better. (Tr. 768). In addition to alcohol, a urinary drug screen revealed the presence of substances matching his prescription medications. (Tr. 769).

3

In March, Mr. Bobak again met with Dr. Goldfarb and reported increased panic and paranoia along with poor sleep. (Tr. 766). He also described working many hours between two jobs and doing well financially. (*Id.*). Dr. Goldfarb refilled his prescriptions. (Tr. 767).

In April, Mr. Bobak informed Dr. Goldfarb that he used cocaine and methamphetamine last month. (Tr. 764). He had not worked for a month and was enjoying the break. (*Id.*). He described manageable symptoms of paranoia and panic and reported sleeping better (*Id.*). Dr. Goldfarb refilled his prescriptions. (Tr. 765).

Mr. Bobak returned to Dr. Goldfarb's office in late April and complained of feeling "down" but not depressed. (Tr. 762). He was scheduled to return to work in two weeks. (*Id.*). He described worsening paranoia, some panic, and erratic sleep. (*Id.*).

In May, Mr. Bobak described feeling "a lot better than last month," and endorsed getting out more and working seven days a week. (Tr. 760). He reported some symptoms of panic and was sleeping okay. (*Id.*).

In June, Mr. Bobak was "doing well" and working six days a week. (Tr. 758). He described his paranoia and sleep habits as "okay" and endorsed some symptoms of panic. (*Id.*). Monthly medical records from July through December contain similar reports. (Tr. 756, 754, 752, 750, 748, 746) (in chronological order).

**2021.** In January and February, Mr. Bobak met with Dr. Goldfarb and reported feeling some panic and described his paranoia and sleep as "okay." (Tr. 742, 744).

In March, Mr. Bobak reported increased anxiety and occasional episodes of hypervigilance. (Tr. 740). Dr. Goldfarb prescribed Lexapro for anxiety with the intention of eliminating benzodiazepines (Valium) from Mr. Bobak's prescription regimen. (Tr. 741).

4

In April, Mr. Bobak reported that Lexapro caused suicidal ideation within one day of his first dose. (Tr. 737). He described his panic attacks as "manageable" and endorsed sleeping okay. (*Id.*). Dr. Goldfarb refilled prescriptions for Suboxone, Valium, and gabapentin and prescribed Seroquel to help with symptoms of mania. (Tr. 738).

In May, Mr. Bobak reported doing well and that he had a new landscaping job. (Tr. 735). He was in a good mood and reported that Seroquel helped control his manic symptoms. (*Id.*). He described his panic attacks as "manageable" and reported his sleep and paranoia were "okay." (*Id.*).

Near the end of May, Mr. Bobak was incarcerated for several days. (*See* Tr. 418). During a medical visit at the Corrections Center, Mr. Bobak reported having schizoaffective disorder and "periods of mania with decompensation in the absence of illicit substances." (*Id.*).

At his next appointment with Dr. Goldfarb in June, Mr. Bobak stated he was recently released after four days of incarceration. (Tr. 733). He reported receiving Suboxone in jail, but his mental health medications were substituted or omitted. (*Id.*). He described his paranoia and panic attacks as "under control." (*Id.*). The doctor noted that confirmatory testing of the most recent urinalysis, date unknown, revealed the presence of marijuana, amphetamines, and benzodiazepines. (Tr. 734). The doctor refilled Mr. Bobak's prescriptions. (*Id.*).

In July, Mr. Bobak returned to Dr. Goldfarb's office and reported that Seroquel was helping his manic symptoms, but he was sleeping poorly and had some paranoia. (Tr. 731). He bought Xanax on the street and continued to use marijuana. (*Id.*). Dr. Goldfarb continued his medications. (Tr. 731-32).

In August, Mr. Bobak reported sleeping better. (Tr. 729). He was in a good mood and denied purchasing or using extra benzodiazepines or other drugs. (*Id.*). He described his paranoia

5

as "okay" and endorsed sleeping better. (*Id.*). At follow-up appointments in September, October, and November, Mr. Bobak reported the same symptoms and denied taking additional medications or using drugs. (Tr. 727, 725, 723, 721) (in chronological order).

In December, Mr. Bobak described his manic symptoms as "fairly stable" with Seroquel, reported sleeping well, and denied taking additional medication or using drugs. (Tr. 719).

**2022.** In January, Mr. Bobak returned to Dr. Goldfarb's office and reported stable moods, "fairly stable" manic symptoms with Seroquel, good sleep, and manageable feelings of paranoia. (Tr. 717). He admitted using marijuana and taking Xanax. (*Id.*).

In February, Mr. Bobak was incarcerated. (*See* Tr. 322). In March, Mr. Bobak returned to jail after he "relapsed on opiates." (Tr. 357).

Mr. Bobak returned to Dr. Goldfarb's office in April and complained of increased paranoia. (Tr. 715). He reported that the psychiatric medication he received in jail, including Depakote and Xanax, made him feel worse and he did not receive Seroquel. (*Id.*). Mr. Bobak admitted to using methamphetamine and K2 in jail and that he was currently on probation and ordered to participate in drug rehabilitation programming. (*Id.*). A urinary drug screen confirmed the presence of methamphetamine. (*Id.*). The doctor refilled his prescriptions for Suboxone, Valium, gabapentin, and Seroquel. (Tr. 716).

In April, Mr. Bobak also began mental health treatment with Tanya Clark, DNP. (Tr. 544). At his initial assessment, Mr. Bobak's mother described "manic behaviors," including breaking into an ex-girlfriend's house to wash his clothes and steal oxycontin and breaking into a business. (*Id.*). Mr. Bobak did not recall these situations. (*Id.*). He reported feeling paranoid most of the time, and is easily agitated, irritable, and aggressive. (*Id.*). He also endorsed audio and visual

hallucinations, cycling between mania (doing "100 things at once") and depression (staying in bed for two to three days), and impulsive shopping behaviors. (Tr. 544-45). He described increased anxiety and difficulty being among crowds after he was shot in the ankle at age 13. (Tr. 545). Since then, he struggled with addiction to pain killers and opioids until he was prescribed Suboxone for chronic pain. (Tr. 547). Mr. Bobak reported he last used amphetamines three years ago and denied drinking alcohol. (*Id.*). A mental status examination recorded Mr. Bobak as cooperative with a euthymic mood and full affect. (*Id.*). He spoke spontaneously and at a normal rate, was logical and organized, and showed sustained attention and concentration. (*Id.*). There was no evidence of paranoia, delusions, or perceptual disturbances, and he displayed normal memory and fair insight and judgment. (*Id.*). Nurse Clark diagnosed Mr. Bobak with bipolar disorder with psychotic features. (Tr. 548). She prescribed hydroxyzine for anxiety and ordered Mr. Bobak to continue Seroquel and gabapentin and discontinue Valium. (*Id.*).

In May, Mr. Bobak met with Dr. Goldfarb, denied using illegal drugs, and described his paranoia and mania as "okay." (Tr. 713). He reported that Seroquel helped his manic symptoms, but he was having nightmares. (*Id.*). Later that month, Mr. Bobak reported feeling "a lot better," described his paranoia as "controlled" and endorsed some manic symptoms and nightmares. (Tr. 711). He denied using illegal drugs. (*Id.*).

Also in May, Mr. Bobak returned to Nurse Clark's office for a follow-up appointment and reported doing a little better. (Tr. 550). He described sleeping okay but endorsed "pretty bad" paranoia and delusions, hypervigilance, decreased motivation, increased irritability and mood swings, easy agitation, and some audio hallucinations. (*Id.*). He admitted taking Valium the day

before his appointment because he "got a little manic" and had a panic attack. (*Id.*). Nurse Clark's mental status examination findings were normal. (Tr. 553).

On June 7, Mr. Bobak received a prescription for Lamictal. (*See* Tr. 530). Later that month, Mr. Bobak met with Dr. Goldfarb and endorsed "controlled" paranoia and some manic symptoms and nightmares. (Tr. 709). In addition, Mr. Bobak described "blacking out" a few days before his appointment, which he attributed to an adverse reaction to Lamictal. (*Id.*).

In July, Mr. Bobak returned to Nurse Clark's office and reported nightmares, described as less vivid and memorable than before, paranoia, anxiety, panic attacks one to two times a week, and fewer episodes of mania. (Tr. 561). He did not report any blackouts and denied audio and visual hallucinations. (*Id.*). Nurse Clark increased his prescriptions for Lamictal and hydroxyzine and prescribed Zyprexa. (Tr. 565). Nurse Clark's mental status examination findings were normal. (Tr. 564).

In July and August, Mr. Bobak met with Dr. Goldfarb and continued to report "controlled" paranoia and vivid nightmares, but otherwise felt "okay." (Tr. 705-07).

In September, Mr. Bobak met with Nurse Clark for a follow-up appointment and reported that Lamictal caused increased moodiness. (Tr. 845). He requested that Nurse Clark return him to Seroquel. (*Id.*). In addition, Mr. Bobak continued to report nightmares that awaken him, panic attacks several times a week, and episodes of mania. (*Id.*). Mr. Bobak's mental status examination was normal, without evidence of paranoia, delusions, or perceptual disturbances. (Tr. 848). Nurse Clark discontinued Lamictal and hydroxyzine, continued Zyprexa, and prescribed Prazosin and Seroquel. (Tr. 849).

On October 20, Mr. Bobak provided a urine sample to his probation officer that was positive for methamphetamine. (Tr. 844). Mr. Bobak returned to Nurse Clark's office the following week and claimed he had an adverse reaction to Zyprexa "about a week ago." (Tr. 839). He stated he did not start the medication when Nurse Clark prescribed it in July but "decided just recently to take the medication." (*Id.*). He reported the medication increased his hostility, depression, anger, and mania. (*Id.*). Nurse Clark noted the pharmacy dispensed his medication in September and October, suggesting Mr. Bobak began taking Zyprexa earlier than he claimed. (*Id.*). Mr. Bobak also reported constant nightmares. (Tr. 840). Nurse Clark's mental status examination findings were normal, without evidence of paranoia, delusions, or perceptual disturbance. (Tr. 842-43). Nurse Clark discontinued Zyprexa and continued Seroquel and Prazosin. (Tr. 843).

Mr. Bobak's positive drug test resulted in court-ordered inpatient and intensive outpatient treatment. (*See* Tr. 837, 901). On initial assessment at the Corrections Center medical facility, Mr. Bobak admitted to using Xanax and Valium daily, beginning five years ago, but stopped taking them four days before. (Tr. 828, 830). Mr. Bobak informed the provider that his longest period of sobriety lasted a few months. (Tr. 831). The provider prescribed Subutex in lieu of Suboxone, doxepin for sleep, and Zyprexa for mood stabilization. (Tr. 831, 835).

**2023.** On January 9, Mr. Bobak was transported to a residential drug-treatment facility for inpatient treatment. (*See* Tr. 901). On admission, Mr. Bobak was diagnosed with anxiolytic-use disorder, stimulant-use disorder, cannabis-use disorder, and bipolar with psychotic features. (Tr. 903). There are few records documenting Mr. Bobak's course of inpatient treatment. The discharge summary indicates he was guarded initially in group and individual sessions but began to share more as he adjusted to the treatment environment. (Tr. 902). He got along well with his

peers and could identify and practice healthy coping skills to manage negative emotions. (*Id.*). On January 17 and 26, Mr. Bobak met with the treatment center's physician and denied depression, mania, and hallucinations. (Tr. 913-14). Mr. Bobak was successfully discharged from the treatment center on March 9, 2023. (Tr. 901).

On January 30, Mr. Bobak attended a telehealth appointment with Nurse Clark where he reported "doing better" and sleeping well. (Tr. 823). He denied feelings of depression, crying spells, self-isolating behaviors, hallucinations, and nightmares but endorsed some anxiety, restlessness, and paranoia. (*Id.*). Nurse Clark recorded normal findings from his mental status examination. (Tr. 825-26).

On March 3, Mr. Bobak spoke with Mary Ramsden, LPC, of Recovery Resources to discuss his impending discharge from Matt Talbot and his outpatient treatment options, including an intensive outpatient program. (Tr. 813; *see also* Tr. 821). Mr. Bobak reported some paranoia and a history of mania and hallucinations but noted that his symptoms are currently well-managed. (Tr. 813, 815-16). He denied having trouble controlling violent behavior or having trouble with understanding, concentrating, or remembering. (Tr. 816). On mental status examination, Ms. Ramsden noted Mr. Bobak was euthymic, cooperative, logical, organized, and oriented, with good memory, good judgment and insight, and sustained attention and concentration. (Tr. 820).

On March 22, Mr. Bobak attended a telehealth appointment with Nurse Clark. (Tr. 808). There, he reported sleeping well and denied mood swings, depressed moods, crying spells, self-isolating behaviors, hallucinations, paranoid thoughts, nightmares, panic attacks, increased anxiety, and excessive worrying. (*Id.*). Nurse Clark recorded normal findings from his mental status examination. (Tr. 810-11). She continued his medications. (Tr. 812).

### III.    Prior Administrative Medical Findings

On September 10, 2022, state agency psychological consultant Jennifer Swain, Psy.D.,
reviewed Mr. Bobak's mental health records and identified one severe impairment (depressive,
bipolar, and related disorders) and one non-severe impairment (substance-addiction disorder).
(Tr. 65, 74). She determined Mr. Bobak can complete routine tasks in a setting that does not
require close focus or concentration, interact superficially with familiar coworkers and supervisors,
and complete routine tasks in a predictable setting where changes are infrequent and easily
explained. (Tr. 66-67, 75-76). Dr. Swain concluded Mr. Bobak's residual functional capacity (RFC)
did not preclude him from working, identified three occupations suitable under the RFC, and
determined he was not disabled. (Tr. 68, 77).

On December 6, 2022, state agency psychological consultant David Dietz, Ph.D., reviewed
the claims on reconsideration and identified bipolar disorder and substance addiction as severe
impairments. (Tr. 82, 90). He adopted Ms. Swain's other findings. (Tr. 85, 93).

### IV.    Relevant Testimonial Evidence

Before the ALJ, Mr. Bobak explained he cannot work because he cycles through episodes
of mania and depression. (Tr. 44). He self-isolates several days a week. (Tr. 49). He also has panic
attacks several times a week, triggered by large crowds, fireworks, and the noise of cars backfiring,
among other things. (Tr. 46, 47-48). When among large crowds, Mr. Bobak feels "horrible," like he
is dying, and usually must be carried out. (Tr. 46). He has left a job during a panic attack and has
been fired from other jobs, typically for attendance issues or incidents during a manic episode.
(Tr. 41-42). He was often late for work because he does not leave the house during a panic attack.
(Tr. 50). Mr. Bobak also reported struggling to pay attention when distractions are present and

having some irritability and paranoia. (Tr. 47-48). He experiences audio and visual hallucinations once every three months. (Tr. 48-49).

When Mr. Bobak is not isolating himself, he spends time outside and mows lawns. (Tr. 40). He can run errands, shop in stores, and microwave simple meals, and he denied difficulty with personal care. (*Id.*).

The VE identified Mr. Bobak's past relevant work as a kitchen helper, cleaner in a commercial or institutional setting, and construction worker II. (Tr. 51). The VE testified that a person of Mr. Bobak's age, education, and experience could perform his past relevant work as a cleaner if subject to the restrictions identified by the ALJ, as follows: he can perform simple, routine tasks; understand short, simple instructions; make simple decisions; tolerate occasional workplace changes, avoid strict production rates or hourly quotas; and avoid more than occasional interaction with co-workers and supervisors, any interaction with the public, and no more than moderate noise. (Tr. 52).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. § 423(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see also* 20 C.F.R. §§ 404.1505(a), 416.905(a).

The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520, 416.920—to determine whether a claimant is disabled:

1.    Was claimant engaged in a substantial gainful activity?

2.     Did claimant have a medically determinable impairment, or a combination of impairments, which is "severe," defined as one which substantially limits an individual's ability to perform basic work activities?

3.     Does the severe impairment meet one of the listed impairments?

4.     What is claimant's residual functional capacity and can claimant perform past relevant work?

5.     Can claimant do any other work considering his or her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to prove whether the claimant has the residual functional capacity (RFC) to perform available work in the national economy. *Id.* The ALJ considers the claimant's RFC, age, education, and past work experience to determine whether the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is the claimant deemed disabled. *Id.*; *see also* 20 C.F.R. §§ 404.1520(b)-(f), 416.920(b)-(f).

Relevantly, a claimant may not receive disability benefits if drug addiction or alcoholism (DAA) is a contributing factor material to the claimant's disability. 42 U.S.C. §§ 423(d)(2)(C), 1382c(a)(3)(J). Social Security Ruling (SSR) 13-2p, 2013 WL 621536 (Feb. 20, 2013), explains the DAA policy and its bearing on the Commissioner's disability determination.[2] When the ALJ

---

[2]     Although the terms "drug addiction" and "alcoholism" are medically outdated, the Social Security Administration (SSA) continues to use them because they appear in the Social Security Act. SSR 13-2p, at *3. Mirroring the medical terminology in the version of the Diagnostic and Statistical Manual of Mental Disorders (DSM) the in use, SSR 13-2p defines DAA as "substance use disorders," which the DSM in turn defines as "maladaptive patterns of substance use that lead to clinically significant impairment or distress." *Id.* Substances include alcohol, illegal drugs, prescription medications, and toxic substances. *Id.*

determines a claimant is disabled considering all medical impairments, including DAA, the ALJ must then determine whether the claimant's DAA is a contributing factor material to the disability determination. 20 C.F.R. §§ 404.1535(a), 416.935(a); *see also* SSR 13-2p. Key to whether DAA is "material" is whether the claimant would still be disabled upon stopping use of drugs or alcohol. 20 C.F.R. §§ 404.1535(b)(1), 416.935(b)(1). If the claimant would be disabled absent substance use, DAA is not a contributing factor material to the determination of disability and the claimant is entitled to benefits. *Id.* §§ 404.1535(b)(2)(ii), 416.935(b)(2)(ii). Conversely if the claimant would not be disabled absent substance use, DAA is a contributing factor and the claimant is not entitled to benefits. *Id.* §§ 404.1535(b)(2)(i), 416.935(b)(2)(i).

## THE ALJ'S DECISION

At Step One, the ALJ determined Mr. Bobak had not engaged in substantial gainful activity since January 1, 2020, the alleged onset date. (Tr. 13). At Step Two, the ALJ identified three severe impairments: polysubstance abuse disorder with an associated opioid use disorder on maintenance therapy, bipolar disorder with psychotic features, and anxiety disorder. (*Id.*). At Step Three, the ALJ determined Mr. Bobak's impairments, including the substance-use disorders, did not meet the criteria of any listed mental impairment because he had moderate limitations in three areas of mental functioning and a marked limitation in one area of mental functioning and he did not show a minimal capacity to adapt to changes in his environment or to demands not already part of his daily life. (Tr. 13-15).

At Step Four, the ALJ determined Mr. Bobak's RFC as follows:

> After careful consideration of the entire record, the undersigned finds that, based on all the impairments, including the substance use disorder, the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: simple, routine tasks; simple short

14

> instructions; simple decisions; occasional workplace changes; no strict production
> rate or hourly quotas; frequently work in isolation; and no more than moderate noise
> level.

(Tr. 16) (cleaned up). The ALJ found Mr. Bobak could not perform any past relevant work when

considering all impairments, including his substance-use disorder. (Tr. 17). At Step Five, the ALJ

concluded Mr. Bobak's impairments, including the substance-use disorder, cause functional

limitations preventing him from performing any work in the national economy. (Tr. 19).

Following SSR 13-2p, the ALJ then determined that if Mr. Bobak stopped using substances, his

other impairments would remain severe but would not meet or medically equal the severity of any

listed impairment. (Tr. 19-20). The ALJ then crafted a new RFC based on an assessment of Mr.

Bobak's impairments absent substance use, as follows:

> The claimant would have the residual functional capacity to perform a full range of
> work at all exertional levels but with the following non-exertional limitations: simple,
> routine tasks; simple, short instructions; simple decisions; occasional workplace
> changes; no strict production rate or hourly quotas; occasional interaction with
> coworkers or supervisors; no public interactions; and no more than moderate noise
> level.

(Tr. 20) (cleaned up). Applying that RFC and the VE's testimony, the ALJ determined Mr. Bobak

could perform his past relevant work as a cleaner in a commercial or institutional setting. (Tr. 21).

The ALJ concluded that because Mr. Bobak could perform his past relevant work if he stopped

using drugs, under SSR 13-2p, his substance-use disorder was a contributing factor material to the

determination of disability and therefore he was not entitled to benefits. (Tr. 22).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the court "must affirm the

Commissioner's conclusions absent a determination that the Commissioner has failed to apply the

correct legal standards or has made findings of fact unsupported by substantial evidence in the

15

record." *Walters*, 127 F.3d at 528. The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "Substantial evidence" is "more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). "Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F.App'x 636, 641 (6th Cir. 2013) (cleaned up).

In determining whether substantial evidence supports the Commissioner's findings, the court does not review the evidence de novo, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence (or indeed a preponderance of the evidence) supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Apart from considering whether substantial evidence supports the Commissioner's decision, the court must determine whether proper legal standards were applied. The failure to apply correct legal standards is grounds for reversal. *Walters*, 127 F.3d at 528. Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its

16

own regulations and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004).

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted); *accord Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked.").

## DISCUSSION

Mr. Bobak argues the ALJ erred in his evaluation of the state agency psychologists' findings by not discussing the supportability and consistency of those findings or explain why she rejected the limitation to superficial social interaction with familiar coworkers and supervisors. (ECF #8 at PageID 1073).

At Step Four, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence. 20 C.F.R. §§ 404.1520(e), 416.920(e). When there is an opinion from a medical source or prior administrative medical finding about a claimant's capabilities, an ALJ must explain how persuasive the ALJ finds that opinion or finding. *See* 20 C.F.R. §§ 404.1520c(b), 416.920c(b); *see also Reeves v. Comm'r of Soc. Sec.*, 618 F.App'x 267, 275 (6th Cir. 2015). The ALJ considers five factors to determine persuasiveness: (1) supportability; (2) consistency; (3) the source's relationship with the claimant, including length of treatment relationship, frequency of examinations, purpose of the treatment relationship, and examining relationship; (4) the source's specialization; and (5) any other factors that tend to support or contradict a medical opinion.

17

20 C.F.R. §§ 404.1520c(c)(1)-(5), 416.920c(c)(1)-(5). The regulations require the ALJ to "explain how [the ALJ] considered the supportability and consistency factors for a medical source's medical opinions." *See id.* at §§ 404.1520c(b)(2), 416.920c(b)(2). The reasons for the ALJ's conclusions about the medical opinions must be stated in a manner that allows the reviewing court to "trace the path of the ALJ's reasoning" from evidence to conclusion. *Stacey v. Comm'r of Soc. Sec.,* 451 F.App'x 517, 519 (6th Cir. 2011). If the ALJ discusses both consistency and supportability and the discussion is supported by substantial evidence, the Court may not disturb the ALJ's findings. *Paradinovich v. Comm'r of Soc. Sec.,* No. 1:20-cv-1888, 2021 WL 5994043, at *7 (N.D. Ohio Sept. 28, 2021), *report and recommendation adopted,* 2021 WL 5119354 (N.D. Ohio Nov. 4, 2021). And even if the ALJ does not use the terms "supportability" or "consistency" in her analysis, the ALJ does not err if she made findings about the opinion that are related to supportability and consistency. *See Anteer v. Kijakazi,* No. 3:20-cv-952, 2021 WL 4424475, at *16 (N.D. Ohio Sept. 27, 2021) (finding no error with the ALJ's failure to use the term "supportability" or "consistency" when evaluating an opinion where the ALJ's findings about the opinion related to "supportability and consistency"); *see also Hannahs v. Comm'r of Soc. Sec.,* No. 3:20-cv-1905, 2021 WL 8342817, at *11 (N.D. Ohio Dec. 15, 2021).

Here, when crafting Mr. Bobak's RFC when he uses substances, the ALJ analyzed the state agency psychologists' findings as follows:

> As for the medical opinions and prior administrative medical findings, the undersigned will not defer or give any specific evidentiary weight, including controlling weight, to any prior administrative medical findings or medical opinions, including those from your medical sources. The undersigned fully considered the medical opinions and prior administrative medical findings in your case, none of which describe the claimant as having disabling problems. That said, so long as the claimant showed up for work under the effects of any of his drugs of choice, it is expected that he would frequently need to work in isolation, which, according to the

vocational expert, would not allow the claimant to perform past relevant work or work that exists in significant numbers.

As noted above, no medical source has described the claimant as having disabling problems, even when considering his substance use disorder. However, [Mr. Bobak's attorney] argued in a pre-hearing brief that the claimant is limited to superficial interactions with others. [Mr. Bobak's attorney] then went further to argue that, based on the Appeals Council decision involving a different claimant, the Appeals Council has defined superficial interaction the way in which one of its judges defined it. The undersigned rejects such bootstrapping. For one thing, the Appeals Council, as a body, has not defined superficial interaction the way one of its judges described superficial. For another thing, the undersigned does not find the above-mentioned opinions of the State agency psychologists who reviewed this claim to be fully persuasive because of their use of the word superficial. More specifically, instead of using such an undefined term, the undersigned believes she has used more appropriate wording in describing a non-sober claimant as needing to frequently work in isolation.

(Tr. 17).

The ALJ did not use the terms "supportability" or "consistency," but did explain that the limitation to superficial interaction was omitted because neither the state agency psychologists nor the regulations define the limitation. Lacking guidance, the ALJ determined a limitation to frequently working in isolation was more appropriate in the context of Mr. Bobak's substance use. Generally, the ALJ is tasked with converting medical statements into RFC findings. *See Tucker v. Berryhill*, No. 3:16-cv-1337, 2017 WL 6442142, at *5 (M.D. Tenn. Dec. 18, 2017). To that end, the ALJ is not required to adopt an opinion verbatim or adopt the state agency psychologists' limitations wholesale. *Reeves v. Comm'r of Soc. Sec.*, 618 F.App'x 267, 275 (6th Cir. 2015).

Mr. Bobak argues that rejecting the term "superficial limitation" as undefined is inappropriate because the Appeals Council has defined the term, and he provided the definition for the record. (ECF #10 at PageID 1073-74). Indeed, Mr. Bobak's representative submitted a remand order issued in an unrelated case where the Appeals Council stated that "'superficial

interaction' is a term that is readily defined, understood and applicable to a work setting, as it speaks to the depth, kind and quality of social interactions, and indicates that the claimant could not have sustained more than shallow cursory interactions with others" and the term is "distinguishable and distinct from 'occasional' which describes the frequency of interaction with others and how much interaction the claimant could tolerate on a sustained basis." (*Id.* at PageID 1074; *see also* Tr. 293-94).

The Appeals Council's definition in a remand order for unrelated case does not constitute an official definition by the SSA that is binding on it at large or on this Court. *See Stephen D. v. Comm'r of Soc. Sec.*, No. 1:21-cv-756, 2023 WL 4991918, at *14 (S.D. Ohio Aug. 4, 2023) ("a single Appeals Council order in an unrelated case is not binding on the Commissioner and has no precedential value beyond the case in which it was entered"), *report and recommendation adopted*, 734 F.Supp.3d 729 (S.D. Ohio May 16, 2024); *Tammy W. v. Comm'r of Soc. Sec.*, No. 2:23-cv-1196, 2024 WL 4284251, at *4 (S.D. Ohio Sept. 25, 2024) (the ALJ was not bound by the Appeals Council's definition of the term "superficial" from an unrelated case).

Superficial is also undefined in SSRs, the relevant regulations, and policies that do bind the SSA. For instance, in SSR 83-10, 1983 WL 31251 (Jan. 1, 1983), the SSA defined terms and concepts frequently used in evaluating disability like "frequent" or "occasional" but did not define "superficial." The Dictionary of Occupational Titles (DOT) defines numerous terms related to interacting with others, including "mentoring," "negotiating," "instructing," "supervising," "diverting," "persuading," "speaking-signaling," "serving," and "taking instructions-helping" but does not define "superficial" as it may relate to any of those terms. DOT, App'x B, http://occupationalinfo.org/appendxb_1.html (last accessed Sept. 15, 2025).

Another district court aptly summarized this definitional omission:

> The Social Security Administration could define "superficial interaction," if it chose to do so, in any number of ways. The Social Security Act, as amended, along with Regulations, Social Security Rulings, Acquiescence Rulings, the Program Operations Manual System (POMS), and the Hearings, Appeals, and Litigation Law Manual (HALLEX) provide the basic guides for adjudication and review of Social Security claims. A single order by the Appeals Council that implements a stipulated judicial order of remand in an unrelated case does not.

*Jared W. v. Comm'r of Soc. Sec.*, No. 2:22-cv-1786, 2022 WL 17842947, at *6 (S.D. Ohio Dec. 22, 2022), *report and recommendation adopted*, 2023 WL 1960600 (S.D. Ohio Feb. 13, 2023). Because Mr. Bobak's suggested definition of "superficial interaction" is not binding on the SSA at large, the ALJ did not err in rejecting "superficial interaction" as an undefined term and instead using a wording the ALJ determined "more appropriate" – needing to frequently work in isolation.

Substantial evidence supports the ALJ's substituted limitation to frequently working in isolation. The ALJ distinguished Mr. Bobak's ability to interact with others when using substances and when sober. (Tr. 14, 21). The record shows Mr. Bobak's mental health crises, including those where he displayed bizarre behavior not suitable for interacting with others, typically occurred in the context of substance use, such as amphetamines and benzodiazepines. (*See, e.g.*, Tr. 357, 441, 544, 715, 731, 734, 764, 839-44). During and after inpatient addiction treatment, the available record, albeit limited, shows normal mental status examination findings and reports from Mr. Bobak that his symptoms are well-managed or nonexistent. (*See* Tr. 813, 815-16, 810-11, 820). I thus conclude (i) the ALJ properly explained not adopting the psychologists' limitation to superficial interaction because the term was undefined, and (ii) the limitation to frequently working in isolation while using substances was supported by substantial evidence.

Turning to the second RFC, which contemplated Mr. Bobak's functional limitations when sober, the ALJ assessed Mr. Bobak with similar limitations as the first RFC but added that he is limited to occasional interaction with coworkers and supervisors and can never interact with the public. (Tr. 20). Mr. Bobak contends that "occasional interaction" and "superficial interaction" are not interchangeable terms and thus the ALJ was required to explain the substitution. (ECF #8 at PageID 1075) (citing *Clampit v. Comm'r of Soc. Sec.*, No. 3:20-cv-1014, 2021 WL 3174111 (N.D. Ohio July 26, 2021)).

It is true that where the RFC conflicts with a medical opinion, the ALJ must explain why the opinion was not adopted. *See Stephen D.*, 734 F.Supp.3d at 733 (citing SSR 96-8p, 1996 WL 374184, at *7 (July 2, 1996)). But there exists a split among the district courts of this Circuit over whether "occasional interaction" and "superficial interaction" are consistent with each other such that the ALJ must explain why she adopted one over the other. Many courts have concluded the terms are not interchangeable because "occasional" speaks to the "quantity of time" a claimant spends interacting with others whereas "superficial" speaks to "the quality of the interactions." *See Hutton v. Comm'r of Soc. Sec.*, No. 2:20-cv-339, 2020 WL 3866855, at *4 (S.D. Ohio July 9, 2020), *report and recommendation adopted*, 2020 WL 4334920 (S.D. Ohio July 28, 2020) (collecting cases). Other courts have held that "occasionally" does not conflict with "superficially" when applied to "interactions," and therefore, the ALJ does not need to explain her reasons for applying one term over the other. *See Stephen D.*, 734 F.Supp.3d at 738 (agreeing with the magistrate judge's Supplemental R&R stating "[an] emphasis on the 'qualitative' nature of the vocationally-undefined adjective 'superficial' as if in conflict with the defined 'quantity' of interaction. . . ignores the

reality that time-limited 'occasional' interactions in an unskilled work setting are reasonably understood to require only surface-level interactions").

But this Court need not resolve this dispute because the ALJ adequately justified the change in terms in the second RFC:

> The difference between a sober claimant's residual functional capacity and a using claimant's residual functional capacity relates to a sober claimant's ability to interact with others. More specifically, when sober, the claimant has displayed no more than moderate limitations with respect to his ability to interact with others, problems the undersigned has accounted for in finding a sober claimant has been restricted to jobs where he would not have to interact with members of the public or have more than occasional interactions with co-workers and supervisors.

(Tr. 20) (cleaned up).

While the ALJ did not use the terms "supportability" or "consistency," the ALJ draws a clear distinction between Mr. Bobak's ability to interact with others when he is using substances and when he is not. The ALJ emphasized that Mr. Bobak's problems interacting with others occurred when he was using drugs or alcohol or suffering an adverse reaction to prescribed medication, records the state agency psychologists reviewed. (Tr. 21). The ALJ also cited Mr. Bobak's most recent medical records from 2023 documenting his post-addiction treatment showing he denied symptoms of depression and anxiety; denied hallucinations, panic attacks, and paranoia; and confirmed he was not self-isolating. (*Id.*). The ALJ's limitation to "occasional interaction" in the second RFC is unquestionably based on the clear improvement in Mr. Bobak's mental health after he stopped using substances.

Inherent in the ALJ's decision is that state agency psychologists did not review those records showing improvement, an implicit finding that the psychologists' opinions concerning Mr. Bobak's ability to interact with others is inconsistent with and not supported by the later-

23

submitted evidence. While the ALJ did not explicitly refer to "consistency" or "supportability," the decision, read as a whole and with common sense, indicates the ALJ discounted the state agency psychologists' findings based on later-submitted records showing normal mental status examinations and Mr. Bobak's statements to medical providers denying the existence of the very symptoms he alleges keep him from working.

Because the ALJ made findings relative to the opinion related to supportability and consistency, and she said enough to allow this Court to trace the path of her reasoning for rejecting the superficial-interaction limitation and for limiting Mr. Bobak to just occasional interactions when sober, I recommend the District Court affirm the Commissioner's decision.

### CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I recommend the District Court **AFFIRM** the Commissioner's decision denying disability insurance benefits and supplemental security income.

Dated: September 18, 2025

_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

### OBJECTIONS, REVIEW, AND APPEAL

**Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge.** *See* **Fed. R. Civ. P. 72(b)(2);** *see also* **28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.**

**Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a**

subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-cv-186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).